**COLLEGE SAVINGS BANK,**
Plaintiff–Appellee,

and

United States, Plaintiff–Appellee,

v.

**FLORIDA PREPAID POSTSECONDARY
EDUCATION EXPENSE BOARD,**
Defendant–Appellant.

No. 97–1246.

United States Court of Appeals,
Federal Circuit.

June 30, 1998.

Kevin J. Culligan, Fish & Neave, New York City, argued for plaintiff-appellee College Savings Bank. Of counsel on the brief were Steven C. Cherny and Robert W. Morris. Also of counsel was Arnold B. Calmann,

Saiber, Schlesinger, Satz & Goldstein, Newark, New Jersey.

Michael S. Raab, Civil Division, Appellate Staff, U.S. Department of Justice, Washington, DC, argued for plaintiff-appellee United States. With him on the brief were Frank W. Hunger, Assistant Attorney General, and Mark B. Stern. Of counsel was Michael E. Robinson.

Anne S. Mason, Mason & Associates, Clearwater, Florida, argued for defendant-appellant. With her on the brief was Joseph C. Mason, Jr. Of counsel was Louis F. Hubener, Assistant Attorney General, Office of the Attorney General, The Capitol, Tallahassee, Florida.

Edward V. Filardi, White & Case, New York City, for amicus curiae New York Intellectual Property Law Association. Of counsel on the brief was Charles P. Baker, Fitzpatrick, Cella, Harper & Scinto, New York City.

Joseph R. Re, Knobbe, Martens, Olson, & Bear, Newport Beach, California, for amicus curiae American Intellectual Property Law Association. With him on the brief was Michael K. Friedland.

Gerald P. Dodson, Arnold, White & Durkee, Menlo Park, California, for amicus curiae Regents of the University of California. With him on the brief were Emily A. Evans, and Richard L. Stanley, Houston, Texas. Of counsel on the brief was P. Martin Simpson, Jr., University of California, Office of Technology Transfer, Alameda, California.

Toni Hunter, Chief, General Litigation Division, Capitol Station, Austin, Texas, for amicus curiae the Commonwealth of Pennsylvania, Commonwealth of Virginia, State of Kansas, State of Louisiana, State of Nevada, State of Oklahoma, and State of Texas.

Before CLEVENGER, RADER, and BRYSON, Circuit Judges.

CLEVENGER, Circuit Judge.

This case requires us to determine whether the Eleventh Amendment bars a federal suit for patent infringement against a non-consenting state. The district court held that it did not and denied Florida Prepaid Postsecondary Education Expense Board's (Florida Prepaid's) motion to dismiss for lack of subject matter jurisdiction. Because Congress clearly expressed its intent to abrogate state sovereign immunity for patent infringement suits brought in federal courts, and because Congress abrogated state immunity pursuant to a valid exercise of power, we affirm the district court's decision denying Florida Prepaid's motion to dismiss. Consequently, we do not reach College Savings Bank's (College Savings') arguments that Florida Prepaid waived its sovereign immunity either by participating in the patent system or by failing to raise the sovereign immunity defense earlier in the litigation.

I

Procedural Posture

College Savings is a New Jersey chartered savings bank located in Princeton, New Jersey. Since 1987, College Savings has sold a certificate of deposit contract known as the CollegeSure® CD. The purpose of the CollegeSure® CD is to help individuals save money for the cost of college education expenses. College Savings guarantees returns sufficient to fund the uncertain future cost of education. The CollegeSure® CD is administered using an apparatus and methods disclosed in College Savings' U.S. Patent No. 4,722,055. Florida Prepaid, a body corporate of the State of Florida, administers a similar investment program aimed at aiding individuals in funding the cost of Florida public colleges and universities.[1] *See* Fla. Stat. § 240.551(1), (3). College Savings claims that, in the course of administering its investment program, Florida Prepaid has directly and indirectly infringed College Savings' patent.

---

1. The district court concluded that, for purposes of immunity from suit, Florida Prepaid was an arm of the State of Florida. *See Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). We agree with the district court, and the parties have not contested this conclusion.

On November 7, 1994, College Savings brought an infringement action against Florida Prepaid in the United States District Court for the District of New Jersey pursuant to the Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act), § 2, 35 U.S.C. §§ 271(h), 296 (1994), which explicitly provides that states may be sued for patent infringement in the federal courts. *Pendente lite,* the Supreme Court handed down its decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which overruled *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and held that Congress could not abrogate the sovereign immunity of the states when acting pursuant to its plenary power to regulate commerce under Article I of the Constitution. *See Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114. In light of the Court's ruling in *Seminole Tribe,* Florida Prepaid moved to dismiss College Savings' claim as barred by the Eleventh Amendment. Florida Prepaid argued that the Patent Remedy Act was an unconstitutional attempt by Congress to use its Article I powers under the Patent Clause, U.S. Const. art. I, § 8, cl. 8, to abrogate state sovereign immunity and to enlarge the federal courts' Article III jurisdiction, which *Seminole Tribe* proscribed. College Savings objected, contending that, in enacting the Patent Remedy Act, Congress was acting pursuant to its enforcement power under section 5 of the Fourteenth Amendment, *see Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The use of this power was not only unaffected but was also expressly sanctioned by the Supreme Court's opinion in *Seminole Tribe,* claimed College Savings. *See* 517 U.S. at 71–72 n. 15, 116 S.Ct. 1114 ("[M]any of those cases arose in the context of a statute passed under the Fourteenth Amendment, where Congress' authority to abrogate is undisputed."). The United States intervened as of right under 28 U.S.C. § 2403(a) (1994) to defend the constitutionality of the Patent Remedy Act.

The district court denied Florida Prepaid's motion to dismiss, because it concluded that Congress had unambiguously abrogated the states' sovereign immunity in the Patent Remedy Act and had acted pursuant to a valid exercise of power under the Fourteenth Amendment. Florida Prepaid took this appeal over which we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994). *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (holding that, pursuant to the collateral order doctrine and 28 U.S.C. § 1291, a state may appeal from a district court order denying it Eleventh Amendment immunity); *see also Swint v. Chambers County Comm'n,* 514 U.S. 35, 41–42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) ("The collateral order doctrine is best understood not as an exception to the final decision rule ... but as a practical construction of it.") (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994)) (internal quotation marks omitted).

II

The Eleventh Amendment

■ We follow the regional circuit's standard of review regarding issues not pertaining to patent law. *See, e.g., Molins PLC v. Quigg,* 837 F.2d 1064, 1066, 5 USPQ2d 1526, 1527 (Fed.Cir.1988). Under the law of the Third Circuit, the regional circuit encompassing New Jersey, our review of a dismissal on sovereign immunity grounds is plenary. *See Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 699 (3d Cir.1996).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment confirms that "each State is a sovereign entity in our federal system" and that " 'it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.' " *Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. 1114 (quoting *The Federalist No. 81,* at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). This immunity is not absolute, however, as Congress, in limited circum-

stances, is empowered to abrogate it. *See Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. 2666.

■ Determining whether Congress has abrogated the states' constitutionally secured immunity from suit in federal court is a two-step inquiry. The first step is to discern whether Congress has unequivocally expressed its intent to abrogate immunity. *See Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. 1114. The second step is to examine whether, in purporting to abrogate immunity, Congress overstepped its constitutional authority. *See id.* We dispense swiftly with the first step of the inquiry before turning our attention to the second, more arduous step.

## III

### Intent to Abrogate

■ Given the importance to our constitutional structure of the Eleventh Amendment's grant of sovereign immunity, a court will not assume that Congress has intended to use its awesome power to abrogate this immunity absent "unmistakably clear" statutory language to that effect. *Dellmuth v. Muth,* 491 U.S. 223, 227–28, 230, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) ("[E]vidence of congressional intent [to abrogate state sovereign immunity] must be both unequivocal and textual."); *see Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242–43, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). There is no dispute that the Patent Remedy Act is replete with language sufficient to satisfy this requirement. *See* 35 U.S.C. §§ 271(h), 296 (1994). Before passage of the Patent Remedy Act, Title 35 stated only that "whoever" without authority made, used, or sold a patented invention infringed the patent. *See* 35 U.S.C. § 271(a) (1988). After the Supreme Court's decision in *Atascadero,* which affirmed that "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute," 473 U.S. at 242, 105 S.Ct. 3142, this court held that the Patent Act contained no such unequivocal statement of intent to abrogate, *see Jacobs Wind Elec. Co. v. Florida Dep't of Transp.,* 919 F.2d 726, 728, 16 USPQ2d 1972, 1973 (Fed.Cir.1990);

*see also Chew v. California,* 893 F.2d 331, 334, 13 USPQ2d 1393, 1396 (Fed.Cir.1990).

In response to our decisions in *Jacobs Wind* and *Chew,* Congress amended the patent laws to express unambiguously its intent to abrogate the sovereign immunity of the states. *See* 35 U.S.C. §§ 271(h), 296 (1994); *see also* 137 Cong. Rec. S4046–48 (daily ed. Mar. 21, 1991) (statement of Sen. DeConcini) (noting that S. 758 was necessary in light of *Jacobs Wind* and *Chew* ). Section 271(h) now states: "As used in this section, the term 'whoever' includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity." Section 296 addresses the sovereign immunity issue even more specifically. It provides:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person ... for infringement of a patent under section 271, or for any other violation under this title.

35 U.S.C. § 296(a) (1994).

We agree with the parties that, with this statutory language, Congress expressed quite pellucidly its intent to abrogate the states' immunity from federal suit for patent infringement. Therefore, the first step of the abrogation inquiry is plainly satisfied.

## IV

### Power to Abrogate

■ Our conclusion that Congress expressed a clear intent to abrogate the states' sovereign immunity leads us to the next step in our inquiry, which is whether Congress acted pursuant to a constitutional grant of power. The power of Congress to abrogate the states' immunity from suit in federal court has been found in only two provisions of the United States Constitution: the Interstate Commerce Clause, U.S. Const. art. I, § 8, cl. 3, *see Union Gas,* 491 U.S. 1, 13–23, 109 S.Ct. 2273 (1989), *overruled by Seminole Tribe,* 517 U.S. at 66, 116 S.Ct. 1114, and the

Fourteenth Amendment, *see Fitzpatrick*, 427 U.S. at 455–56, 96 S.Ct. 2666. In *Seminole Tribe*, however, the Supreme Court held that Congress' vast power to regulate interstate commerce was nevertheless subordinate to the protection from federal suits by private litigants granted to the states by the Eleventh Amendment. *See* 517 U.S. at 72–73, 116 S.Ct. 1114. In the wake of *Seminole Tribe*, then, the solitary legislative tool that the Supreme Court has recognized for abrogating the sovereign immunity of the states is Congress' power to enforce the substantive provisions of the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 5.

The Senate and House committee reports expressly invoked the Fourteenth Amendment as authority for enacting the Patent Remedy Act. *See* S.Rep. No. 102–280, at 8 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3087, 3094 ("[T]he bill is justified as an acceptable method of enforcing the provisions of the fourteenth amendment."); H.R.Rep. No. 101–960, at 40 (1990). Notwithstanding this invocation of power, we must still examine the legitimacy of the congressional action. *See Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.").

The Fourteenth Amendment is a clear limitation on the authority of the states. *See Fitzpatrick*, 427 U.S. at 453–56, 96 S.Ct. 2666. By expanding the federal power at the expense of state autonomy, the Fourteenth Amendment "fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114 (citing *Fitzpatrick*, 427 U.S. at 455, 96 S.Ct. 2666). Section 1 of the amendment provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Standing behind the imperative of section 1 is section 5, which grants to Congress the power to enforce the prohibitions of section 1 "by appropriate legislation."

The enforcement provision of the Fourteenth Amendment is far from unique in the constitutional scheme. Virtually identical provisions appear in the Thirteenth, Fifteenth, Nineteenth, Twenty-third, Twenty-fourth, and Twenty-sixth Amendments. In determining whether legislation enacted by Congress is an appropriate use of Congress' enforcement power, the Supreme Court has stated that Congress may use any rational means to effectuate the substantive provisions of the Amendments. *See South Carolina v. Katzenbach*, 383 U.S. 301, 324, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (addressing the power of Congress under section 2 of the Fifteenth Amendment). To give meaning to this so-called rational relationship test, the Supreme Court has looked repeatedly to Chief Justice Marshall's classic formulation concerning the express powers of Congress, which was set forth many years before the enactment of the Civil War Amendments: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819); *see City of Boerne v. Flores*, —— U.S. ——, ——, 117 S.Ct. 2157, 2163, 138 L.Ed.2d 624 (1997) (stating that, with regard to Congress' enforcement power under the Fourteenth Amendment: " 'Whatever legislation is appropriate, that is adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain . . . if not prohibited, is brought within the domain of congressional power' " (quoting *Ex parte Virginia*, 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879))); *South Carolina v. Katzenbach*, 383 U.S. at 326, 86 S.Ct. 803. Therefore, we are obliged to consider whether the objective of the legislation is constitutionally legitimate and whether the means crafted by Congress are plainly adapted to achieving this objective.

## A. *Objective of the Patent Remedy Act*

Florida Prepaid first asserts that the goal of the Patent Remedy Act, which is to prevent states from infringing patents or obliging them to compensate the patent owner when they do, is not a legitimate objective under the Fourteenth Amendment. This is so, we understand Florida Prepaid to say, because the amendment was adopted to remedy racial discrimination, and according to Florida Prepaid, the authority of Congress under section 5 of the Fourteenth Amendment is narrowly confined to statutes that promote enforcement of the Equal Protection Clause against discrimination.

Undeniably, the Civil War Amendments were adopted to thwart state-sponsored racial discrimination. *See The Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 71–72, 21 L.Ed. 394 (1872) ("[N]o one can fail to be impressed with the one pervading purpose found in [the Civil War Amendments], lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him."). However, in enforcing the Equal Protection Clause of the Fourteenth Amendment, the Supreme Court has broadened the protections conferred beyond just prohibiting racial discrimination. For example, the clause has been held to prohibit unjustified discrimination on the basis of gender, *see United States v. Virginia,* 518 U.S. 515, 534, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), alienage, *see Truax v. Raich,* 239 U.S. 33, 39, 36 S.Ct. 7, 60 L.Ed. 131 (1915), parentage, *see Glona v. American Guarantee & Liability Ins. Co.,* 391 U.S. 73, 76, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), criminal conviction, *see Rinaldi v. Yeager,* 384 U.S. 305, 308–09, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), and type of business, *see Atchison, Topeka & Santa Fe Ry. v. Vosburg,* 238 U.S. 56, 62, 35 S.Ct. 675, 59 L.Ed. 1199 (1915). Consequently, the meaning of the Equal Protection Clause of the Fourteenth Amendment cannot be limited to the particular ill—racial discrimination—that Congress, at the time of the enactment of the Civil War Amendments, intended to redress.

▮ Equally undeniably, the Supreme Court has enforced the Due Process Clause of the Fourteenth Amendment against the states and has read it expansively to prohibit state actions wholly unrelated to discrimination of any sort. *See, e.g., Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (horse trainer's license protected); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9–12, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (protecting utility service); *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (protecting recipients of public assistance from a cessation of benefits without a pre-termination hearing). Florida Prepaid cites no authority forbidding Congress from enacting statutes that abrogate state immunity in order to protect persons from property deprivations without due process of law. Surely the enforcement power of Congress under section 5 must embrace the full range of behavior that the Supreme Court has held to violate the substantive provisions in section 1 of the Amendment. *See City of Boerne,* — U.S. at —, 117 S.Ct. at 2163 ("The 'provisions of this article,' to which § 5 refers, include the Due Process Clause of the Fourteenth Amendment."). We therefore reject the proposition that congressional authority under section 5 is restricted to only a certain provision of the Fourteenth Amendment, namely the Equal Protection Clause.

▮ Protecting a privately-held patent from infringement by a state is certainly a legitimate congressional objective under the Fourteenth Amendment, which as noted above, empowers Congress to prevent state-sponsored deprivation of private property. It is, of course, beyond cavil that the patent owned by College Savings is property. *See Hartford–Empire Co. v. United States,* 323 U.S. 386, 415, 65 S.Ct. 373, 89 L.Ed. 322, 64 USPQ 18, 31–32 (1945) ("That a patent is property, protected against appropriation both by individuals and government, has long been settled."); *Consolidated Fruit–Jar Co. v. Wright,* 94 U.S. 92, 96, 24 L.Ed. 68 (1876) ("A patent for an invention is as much property as a patent for land."); *Patlex Corp. v.*

*Mossinghoff,* 758 F.2d 594, 599, 225 USPQ 243, 246 ("It is beyond reasonable debate that patents are property."), *modified in other respects,* 771 F.2d 480, 226 USPQ 985 (Fed.Cir.1985); *see also* 35 U.S.C. § 261 (1994) ("[P]atents shall have the attributes of personal property."). This is so because, at bottom, a patent is but the right to exclude others from making, using, or selling an invention, *see* 35 U.S.C. § 271 (1994); *Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 549, 14 L.Ed. 532 (1852) ("The franchise which the patent grants, consists altogether in the right .to exclude every one from making, using, or vending the thing patented, without the permission of the patentee."), and the right to exclude others is established as among the "most essential sticks in the bundle of rights that are commonly characterized as property," *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *see Schenck v. Nortron Corp.,* 713 F.2d 782, 786 n. 3, 218 USPQ 698, 701 n. 3 (Fed.Cir.1983) ("The patent right is but the right to exclude others, the very definition of 'property.' "). Indeed, the United States' "unlicensed use of a patented invention is properly viewed as a taking of property under the Fifth Amendment." *Hughes Aircraft Co. v. United States,* 86 F.3d 1566, 1571, 39 USPQ2d 1065, 1068 (Fed.Cir.1996), *vacated on other grounds,* —— U.S. ——, 117 S.Ct. 1466, 137 L.Ed.2d 680 (1997). In subjecting the states to suit in federal court for patent infringement, Congress sought to prevent states from depriving patent owners of their property without due process through infringing acts, an objective that comports with the text and judicial interpretations of the Fourteenth Amendment. The Constitution itself, by recognizing the importance of securing the rights of inventors to their inventions, *see* U.S. Const. art. I, § 8, signals a reason for Congress to secure patent property from risk of deprivation.

■ In support of its contention that the objective of the Patent Remedy Act is not permissible under the Fourteenth Amendment, Florida Prepaid argues that, even if it has deprived College Savings of its property, it has not done so without providing due process. As a result, no constitutional violation occurred. Absent a constitutional violation, Florida Prepaid continues, Congress is without power to abrogate under the Fourteenth Amendment. This argument, although beguiling, must fail. It is true that College Savings could have sought relief in the Florida Legislature through a claims bill, *see* Fla. Stat. § 11.065,[2] and that this avenue of relief most likely provides sufficient process to preclude a violation of the Fourteenth Amendment. However, as the Supreme Court instructed in *South Carolina v. Katzenbach,* Congress may forbid even state conduct that is not unconstitutional so long as the legislation is aimed at preventing a violation. *See* 383 U.S. at 333–34, 86 S.Ct. 803 (upholding legislation banning literacy tests and similar voting requirements despite the facial constitutionality of the measures, because Congress was responding to prior discriminatory application of such measures); *Katzenbach v. Morgan,* 384 U.S. 641, 658, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Therefore, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne,* 117 S.Ct. at 2163.

Under Florida Prepaid's interpretation, abrogation of a state's immunity from suit under the Patent Remedy Act would apply only to those states that fail to provide a remedy for compensation for patent infringement by the state, or that provide a remedy of such inconsequence as to be illusory. This interpretation imputes to Congress an intent

---

2. Florida Prepaid also asserts that College Savings could have brought a takings claim in Florida State Court. Although the Supreme Court of the State of Florida has allowed a takings claim premised on a patent infringement theory to proceed in state court, *see Jacobs Wind Elec. Co. v. Dep't of Transp.,* 626 So.2d 1333, 1337 (Fla. 1993), and we have opined in dicta that such a claim could be brought in state court, *see Jacobs*

*Wind,* 919 F.2d at 728, 16 USPQ2d at 1974, such process may be illusory. The Supreme Court has not indicated whether a takings claim based on patent infringement is cognizable in state courts in light of the fact that Congress has declared that claims arising under federal patent law are within the exclusive province of the federal courts. *See* 28 U.S.C. § 1338(a) (1994).

to overlook the enforcement of federal patent rights on a piecemeal, state-by-state basis and to deny Congress the authority to subject all states to suit for patent infringement in the federal courts, regardless of the extent of procedural due process that may exist at any particular time. We do not read the precedent to permit abrogation of the state's immunity only in those instances in which a state provides no due process in its own courts to redress the alleged misconduct. We also do not read the precedent to require Congress to customize statutes enacted under the Fourteenth Amendment to take account of such variations as may exist among the states in remedies offered for alleged infringement of patents. In sum, the fact that Florida may today have some process available to a patentee asserting infringement by the state does not preclude Congress from exercising its powers under the Fourteenth Amendment through the Patent Remedy Act.

 Florida Prepaid next argues that the objective of the Patent Remedy Act is impermissible because, if we were to allow it, Congress would be able to abrogate state sovereign immunity pursuant to its Article I power, which is the exact result that the Supreme Court proscribed in *Seminole Tribe.* *See* 517 U.S. at 72–73, 116 S.Ct. 1114. This is because the "property" protected by Congress under the Fourteenth Amendment, in this case a patent, is federally created property under Title 35 of the U.S.Code. *See* 35 U.S.C. § 101 et seq. (1994). Florida Prepaid asserts that, just as Congress created the patent system, it could ostensibly choose to create any sort of property using its Article I powers, and then, argues Florida Prepaid, abrogate the states' immunity to suit for the deprivation of that property. Surely, urges Florida Prepaid, Congress cannot accomplish indirectly through the Fourteenth Amendment precisely what it is forbidden from doing directly through Article I.

This argument has, in fact, met with some acceptance among our sister circuits. *See Chavez v. Arte Publico Press,* 139 F.3d 504, 510–11, 46 USPQ2d 1541, 1546 (5th Cir.1998) (holding that Congress could not abrogate a state's immunity to suit for copyright infringement through the Due Process Clause of the Fourteenth Amendment because "it [would be] a direct end-run around *Seminole's* holding that Article I powers may not be employed to avoid the Eleventh Amendment's limit on the federal judicial power. Congress could easily legislate 'property' interests and then attempt to subject states to suit in federal court for the violation of such interests."); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 131 F.3d 353, 361, 45 USPQ2d 1001, 1007 (3d Cir.1997) (stating that the right to be free of unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994), does not implicate a property right under the Fourteenth Amendment and noting: "If a state's conduct impacting on a business always implicated the Fourteenth Amendment, Congress would have almost unrestricted power to subject states to suit through the exercise of its abrogation power. Congress could pass any law that tangentially affected the ability of businesses to operate and then create causes of action against the states in federal court if they infringed on those federally created rights."); *cf. In re Creative Goldsmiths, Inc.,* 119 F.3d 1140, 1146–47 (4th Cir.1997) (holding that Congress could not validly abrogate state sovereign immunity under the Bankruptcy Code because "[i]f the Fourteenth Amendment is held to apply so broadly as to justify Congress' enactment of the Bankruptcy Code as a requirement of due process, then the same argument would justify every federal enforcement scheme as a requirement of due process under the Fourteenth Amendment"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998).

These cases miss the mark, however, because they ignore the essential fact that, because the Fourteenth Amendment was enacted subsequent to the Eleventh Amendment, unlike Article I, it expressly qualified the principle of sovereign immunity. *See Union Gas,* 491 U.S. at 41–42, 109 S.Ct. 2273 (Scalia, J., dissenting) (" 'The Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited' by the [Fourteenth Amendment]." (citations omitted) (quoting *Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. 2666)). Our sister

circuits wrongly equate the result afforded by congressional power under the Fourteenth Amendment and Article I with the constitutional structure under which Congress governs and the federal courts exercise jurisdiction. When the states adopted the Fourteenth Amendment and consented to cede a portion of their authority to the federal government, it was within their contemplation that they limited their Eleventh Amendment immunity. *Fitzpatrick* teaches so, and we adhere to its reasoning. *See* 427 U.S. at 453–54, 96 S.Ct. 2666.

Although there may be some property interests that are not protected by the Fourteenth Amendment, *see, e.g., Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that the Fourteenth Amendment does not secure to persons the right to prevent disclosure of their arrest), and discriminating between property interests that are protectable under the Fourteenth Amendment and those that are not may prove a difficult task, such central and historic fixtures in the realm of property as patents surely warrant protection from deprivation by states. Unlike many forms of property only recently recognized, patents were certainly considered property at the time of the adoption of the Fourteenth Amendment in 1868. *See Brown v. Duchesne,* 60 U.S. (19 How.) 183, 197, 15 L.Ed. 595 (1856) ("For, by the laws of the United States, the rights of a party under a patent are his private property."). To claim that patents do not warrant protection is tantamount to asserting that Congress may not, under any circumstance, abrogate the states' Eleventh Amendment immunity pursuant to the Due Process Clause when seeking to protect persons from the risk of unlawful deprivation of their property. Such would, in our view, amount to a direct contradiction of the text of the Fourteenth Amendment and its application by the Supreme Court.

If the reasoning of *Fitzpatrick* is to retain vitality, it must be that protecting a well-established property interest such as a patent is a permissible objective under the Fourteenth Amendment. *See* 427 U.S. at 456, 96 S.Ct. 2666 ("We think that Congress may, in determining what is 'appropriate leg-

islation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts."). We therefore conclude that the first part of Chief Justice Marshall's formulation of the test to identify "appropriate legislation" under the Fourteenth Amendment is met. *See McCulloch v. Maryland,* 17 U.S. at 421. The objective of the Patent Remedy Act, which is to protect privately-held patent property from deprivation by states, is constitutionally legitimate.

### B. *Congruence between Means and Potential Harm*

Florida Prepaid also suggests that, even if the Patent Remedy Act's objective is constitutionally legitimate, the means by which Congress sought to protect the patent right are out of proportion to the harm that the Patent Remedy Act endeavors to prevent, or in the words of Chief Justice Marshall, the means are not "plainly adapted" to the constitutional end and thus wither under constitutional scrutiny. Florida Prepaid reminds us that "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell,* 400 U.S. 112, 128, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (opinion of Black, J.).

The Supreme Court's decision in *City of Boerne* guides our analysis as we attempt to discern whether the Patent Remedy Act is an appropriate means through which Congress exercised its power to enforce the substantive guarantees of the Fourteenth Amendment. That case challenged the Religious Freedom Restoration Act (RFRA) as an unconstitutional extension of Congress' power to enforce the substantive provisions of the Fourteenth Amendment. *See* 117 S.Ct. at 2160. Through RFRA, Congress sought to circumvent the Supreme Court's ruling in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which eschewed the "compelling state interest" test of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), for neutral, generally applicable laws that might

incidentally burden a religious practice. *See City of Boerne*, 117 S.Ct. at 2160–61. Congress, through RFRA, reinstated the compelling state interest test, which required that a state show a compelling interest when enacting laws that, although facially neutral in their treatment of religion, imposed a substantial burden on religious exercise. *See* 42 U.S.C. § 2000bb–1 (1994). In *City of Boerne*, the Court, noting that Congress' enforcement power did not extend to include the "power to decree the substance of the Fourteenth Amendment's restrictions on the States," *id.* 117 S.Ct. at 2164, declared RFRA an unconstitutional attempt by Congress to legislate the substance of the Fourteenth Amendment, *see id.* 117 S.Ct. at 2172. The Court admitted: "While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed." *Id.* 117 S.Ct. at 2164.

As an aid in distinguishing between provisions that remedy or prevent unconstitutional actions and those that change the substance of the Fourteenth Amendment, the Court offered the following observation: "There must be a proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Id.*

### 1. Injury to be prevented

In *City of Boerne*, because no evidence was before Congress reflecting examples of modern instances of generally applicable laws passed because of religious bigotry, the Supreme Court inferred that the injury to be prevented or remedied by RFRA was slight. *See id.* 117 S.Ct. at 2169. In contrast, the Court noted that, in *South Carolina v. Katzenbach*, which upheld various provisions of the Voting Rights Act of 1965, the congressional action was "necessary to 'banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century.'" *City of Boerne*, 117 S.Ct. at 2167 (quoting

*South Carolina v. Katzenbach*, 383 U.S. at 308, 86 S.Ct. 803). The remedies provided by the Voting Rights Act were deemed necessary given the tenacious pervasiveness of discrimination in state electoral processes. *See id.*

Florida Prepaid argues that, as with the absence of injury in *City of Boerne*, Congress was confronted with no evidence of widespread patent infringement by the states, and that absent this factual predicate, abrogating state sovereign immunity was impermissible. The legislative record of the Patent Remedy Act contains indications that the extent of previous patent infringement by states had not yet risen to emergency levels. *See Patent Remedy Clarification Act; Hearings on H.R. 3886 Before the Subcomm. on Courts, Intellectual Property, and the Admin. of Justice of the House of Representatives Comm. on the Judiciary*, 101st Cong. 22 (1990) (statement of Rep. Kastenmeier) ("We do not have any evidence of massive or widespread violation of patent laws by the States either with or without this immunity.") [hereinafter *Hearings*]. Nonetheless, the same record discloses significant instances of alleged patent infringement by states or state entities. *See id.* at 10–11, 30–31, 51 (prepared statements of Jeffrey M. Samuels, Acting Commissioner of Patents and Trademarks, United States Department of Commerce; Robert P. Merges, Associate Professor of Law, Boston University School of Law; and William S. Thompson, President, American Intellectual Property Law Association); *see also Jacobs Wind*, 919 F.2d at 728, 16 USPQ2d at 1973 (affirming the dismissal of an infringement claim against the state as barred by the Eleventh Amendment because Congress failed to enunciate clearly in the text of the patent laws that it intended to abrogate the sovereign immunity of states); *Chew*, 893 F.2d at 332–33, 13 USPQ2d at 1394 (same); *Watts v. University of Del.*, 622 F.2d 47, 53, 206 USPQ 106, 112 (3d Cir.1980) (involving an infringement action against an arm of the State of Delaware); *Lemelson v. Ampex Corp.*, 372 F.Supp. 708, 711–12, 181 USPQ 313, 314–15 (N.D.Ill.1974) (denying a motion to dismiss a claim against a state for contributory infringement, because the state had waived its immunity under *Parden v.*

*Terminal Railway,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)); *Hercules, Inc. v. Minnesota State Highway Dep't,* 337 F.Supp. 795, 798, 172 USPQ 644, 647 (D.Minn.1972) (concluding that injunctive relief under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), but not monetary relief under Title 35, was available to a patentee for alleged infringement by a state); *William C. Popper & Co v. Pennsylvania Liquor Control Bd.,* 16 F.Supp. 762, 763 (E.D.Pa.1936) (dismissing an infringement claim as barred by the Eleventh Amendment); *Automobile Abstract & Title Co. v. Haggerty,* 46 F.2d 86, 87–88 (E.D.Mich.1931) (same); *Warren Bros. Co. v. Kibbe,* 43 F.2d 582, 584 (D.Ore.1925) (holding that a state had waived its immunity to suit for patent infringement by agreeing to indemnify contractors for royalties owed due to their infringement of patents for paving materials); *cf. May v. Board of Comm'rs,* 30 F. 250, 261 (C.C.N.D.Ohio 1887) (holding that Ohio counties could be sued for patent infringement). In addition, the legislative history reflects the recognition that, as commercialization of basic research continues, particularly in the biotechnology field, state universities are becoming increasingly more active in the commerce of intellectual property, and, naturally, an increase in the number of patent suits against the states likely will ensue. *See* 137 Cong. Rec. S4046 (daily ed. Mar. 21, 1991) (statement of Sen. DeConcini); H.R.Rep. No. 101–960, at 38 (1990). Certainly the harm that Congress perceived in this case is neither of the magnitude nor caliber of the harm that the Voting Rights Laws sought to remedy. We cannot say, however, that absent harm of that order, Congress has no power to make the states amenable to suit in federal court for breaching the guarantees of the Fourteenth Amendment.

Also important, when states infringe patents, they cause considerable harm to the patentee and the patent system as a whole. Absent the right to sue a state under Title 35 for infringement, a patent declines drastically in value, because there is no access to the remedies of attorney fees and treble damages. *See* 35 U.S.C. §§ 284, 285 (1994). Although injunctive relief would seem to be available against the state in federal court

under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), such relief falls far short of the protection that Congress has provided. This is so because, under the federal patent law, damages begin to accrue at the time that the alleged infringer receives notice of infringement, either through a marked product or directly from the patentee, *see* 35 U.S.C. § 287 (1994), whereas injunctive relief prevents only future infringement, without compensating for past infringement. Consequently, an equitable remedy such as an injunction, preventing only future damage, would provide an insufficient disincentive to infringe. Furthermore, without the disincentive provided by the patent law's damages provisions, a patentee of inventions utilized primarily by states would suffer even greater harm, because an overwhelming portion, rather than a minor subset, of the potential market would be more apt to infringe or to procure cheaper infringing devices until the patentee brings suit. This would render the patentee's patent almost worthless. *See James v. Campbell,* 104 U.S. 356, 358, 26 L.Ed. 786 (1882) (stating with regard to infringement by the federal government: "Many inventions relate to subjects which can only be properly used by the government, such as explosive shells, rams, and submarine batteries to be attached to armed vessels. If it could use such inventions without compensation, the inventors could get no return at all for their discoveries and experiments."); *see also Jacobs Wind,* 919 F.2d at 727, 16 USPQ2d at 1973 (patent on a tidal flow system); *Chew,* 893 F.2d at 332, 13 USPQ2d at 1394 (patent on a method for testing automobile exhaust emissions).

### 2. *Means adopted*

Against this harm to patent holders and the entire patent system, we balance the burden placed on the states by subjecting them to suit in federal court for infringement. For "[w]hile preventive rules are sometimes appropriate remedial measures, there must be a congruence between the means used and the ends to be achieved." *City of Boerne,* 117 S.Ct. at 2169. The ends to be achieved by the Patent Remedy Act are

to assure that patentees will not be deprived of their property rights by claims of immunity. Although this may be a modest end, at least when compared with the goals of the Voting Rights legislation, the means of effecting that end are similarly modest and circumscribed. The Patent Remedy Act holds states monetarily accountable for patent infringement, an unlawful act. *See* 35 U.S.C. § 271 (1994). Conduct that could constitute patent infringement is part of the states' commercial activity, not its central political governance role. Thus, the Patent Remedy Act will rarely constrict or restrain a state in the performance of its core governmental functions. In contrast, in *City of Boerne*, RFRA's "[s]weeping coverage ensure[d] its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." 117 S.Ct. at 2170. Any act of a state that could be shown to burden substantially the practice of religion was affected by RFRA, even actions that were otherwise perfectly legitimate. Here, the Patent Remedy Act speaks only to a state's unauthorized production, use, or sale of a patented device or method. A state found to have infringed a patent is subject to the same consequences as a private party infringer, namely damages subject to trebling, attorney fees, and injunctive relief. The damages in such cases have long been established by Congress as proper and necessary to afford full compensation to a patentee. There is no sound reason to hold that Congress cannot subject a state to the same civil consequences that face a private party infringer. As noted in the legislative history of the Patent Remedy Act, states now engage fully in the intellectual property marketplace, even often asserting their own patent rights. *See Hearings, supra*, at 36–37; *see also Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1564, 43 USPQ2d 1398, 1402 (Fed.Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1548, 140 L.Ed.2d 695 (1998). The Act subjects states to no greater burdens than those that must be shouldered by private parties. Therefore, the burden placed upon states by the Patent Remedy Act is not so great as to undermine the congressional abrogation of immunity.

Unlike the statute at issue in *City of Boerne*, the burden that the Patent Remedy Act places on states is slight, and it is not disproportionate or incongruous with the significant harm to patent holders who, absent abrogation of Eleventh Amendment immunity, would be unable to enforce fully the rights conveyed by their patent. The Patent Remedy Act thus achieves the congruence between the injury to be prevented and the means adopted to remedy the injury that distinguishes a permissible, remedial exercise of Congress' power under the Fourteenth Amendment from an impermissible extension of the substance of the Fourteenth Amendment rights themselves. *See City of Boerne, supra*. Hence, the second part of Chief Justice Marshall's test for "appropriate legislation" is satisfied; the means of the Patent Remedy Act are plainly adapted to its end. *See McCulloch v. Maryland*, 17 U.S. at 421.

## V

### Conclusion

Because Congress clearly expressed its intent to abrogate the sovereign immunity of the states to suit for patent infringement, and because Congress exercised its intent pursuant to a valid exercise of power, the decision of the district court denying Florida Prepaid's motion to dismiss the claim as barred by the Eleventh Amendment is

*AFFIRMED.*