**Albert J. VELASQUEZ, Plaintiff–Appellant,**

**v.**

**Dorothy J. FRAPWELL and the Trustees of Indiana University, Defendants–Appellees,**

**and**

**United States of America, Intervening Plaintiff–Appellant.**

Nos. 98–1547, 98–2034.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1998.

Decided Nov. 12, 1998.

**390**

Michael A. Kiefer (argued), Garrison & Kiefer, Indianapolis, IN, for Albert J. Velasquez in No. 98–1547.

Susan B. Tabler, Pamela V. Keller (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Dorothy J. Frapwell.

Pamela V. Keller (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Trustees of Indiana University in No. 98–1547.

Michael A. Kiefer, Garrison & Kiefer, Indianapolis, IN, for Albert J. Velasquez in No. 98–2034.

Susan B. Tabler, Pamela V. Keller (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Trustees of Indiana University in No. 98–2034.

Mark Stern, Department of Justice, Civil Division, Appellate Section, Carl E. Goldfarb (argued), Department of Justice, Civil Division, Appellate Staff, Washington D.C., for United States in No. 98–2034.

Before POSNER, Chief Judge, and CUMMINGS and EVANS, Circuit Judges.

POSNER, Chief Judge.

The plaintiff was employed as a lawyer by Indiana University. He was fired, and sued the University, seeking damages. The suit charges national-origin discrimination (the plaintiff is Hispanic) in violation both of Title VII and the equal protection clause. It also (and this turns out to be the more interesting part of the case) charges a violation of the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301 *et seq.* USERRA forbids employment discrimination on the basis of membership in the armed forces, § 4311(a), and authorizes private suits for damages or injunctive relief against the employer—including a state employer. §§ 4303(4)(A)(iii), 4323(c)(1)(A), (3), (7). Velasquez is a member of the Indiana National Guard, and he contends that he was fired in part because of absences from his university job that were necessitated by his national guard work.

The district court granted summary judgment for the University on the national-origin claim and dismissed the USERRA claim as barred by the Eleventh Amendment; Indiana University is conceded to be an arm of the State of Indiana. *Woods v. Indiana University–Purdue University*, 996 F.2d 880, 883 (7th Cir.1993); *Shelton v. Trustees of Indiana University*, 891 F.2d 165, 166 (7th Cir.1989); *Kashani v. Purdue University*, 813 F.2d 843 (7th Cir.1987); see *Regents of University of California v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). The United States intervened in the suit, as was its right, 28 U.S.C. § 2403(a); *Varner v. Illinois State University*, 150 F.3d 706, 708 (7th Cir.1998); *College Savings Bank v. Flor-*

ida Prepaid Postsecondary Education Expense Board, 148 F.3d 1343, 1346 (Fed.Cir. 1998); In re Creative Goldsmiths of Washington, D.C., Inc., 119 F.3d 1140, 1143 (4th Cir.1997), to defend the statute. USERRA explicitly subjects states to liability for violating it, 38 U.S.C. § 4323(c)(2)(B)(7), and the effect of the district court's invoking the Eleventh Amendment was to invalidate this provision. Although one count of the complaint names the plaintiff's supervisor as defendant, the count based on USERRA names only the university, that is, the state.

■ The Supreme Court held recently that Congress cannot abrogate a state's sovereign immunity by a federal statute based on Congress's power over various forms of commerce, because that power was conferred on Congress by the original Constitution, which predates the Eleventh Amendment and so cannot limit it. Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Velasquez responds that USERRA is based on section 5 of the Fourteenth Amendment, and the United States that it is based on the grant of war powers in Article I and that this grant should be treated differently from the grant of power over commerce. Velasquez also supports the argument of the United States, but the United States takes no position on Velasquez's invocation of the Fourteenth Amendment.

■ Section 5 authorizes Congress to pass statutes enforcing the amendment's other provisions, and since it both postdates the Eleventh Amendment and is part of an amendment designed to shift power from the states to the federal government, it is not limited by the earlier amendment. Seminole Tribe v. Florida, supra, 517 U.S. at 65–66, 116 S.Ct. 1114; Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Velasquez argues that USERRA enforces the equal protection clause of the Fourteenth Amendment by creating remedies for military personnel who are discriminated against on the basis of their military status. Little significance can be attached to the fact that the statute does not purport to be based on section 5. EEOC v. Wyoming, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983); Varner v. Illinois State

University, supra, 150 F.3d at 712; Doe v. University of Illinois, 138 F.3d 653, 658–60 (7th Cir.1998); Goshtasby v. Board of Trustees, 141 F.3d 761, 768 (7th Cir.1998); Ussery v. Louisiana, 150 F.3d 431, 436–37 (5th Cir. 1998). USERRA does not indicate which provision or provisions of the Constitution authorize it; Congress could not have cared; it would doubtless be happy if any provision enabled the section of USERRA that authorizes suits against the state to survive challenge under the Eleventh Amendment. If that provision is section 5 of the Fourteenth Amendment, Congress would hardly object to our holding that USERRA is authorized by section 5's grant of power to Congress.

But if section 5 is not to be distended beyond all reasonable bounds, it cannot be used to authorize legislation so remote from the policies and objectives of the equal protection clause as this statute is. City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); Mills v. Maine, 118 F.3d 37, 47–49 (1st Cir.1997); see generally Pennhurst State School v. Halderman, 451 U.S. 1, 15–17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), warning against expansive interpretations of section 5. To begin with, there can be no contention that to fire a worker because his military service prevents him from discharging the duties of his civil job actually violates the equal protection clause; for there is no invidious or irrational discrimination in such an action. So there can be no question of USERRA's "enforcing" a provision of the Fourteenth Amendment in a literal sense. Nor do military personnel constitute a historically disadvantaged ("suspect") class, like members of racial and religious minorities, who might be thought in need of special protections—of a glacis in front of the core prohibitions of the amendment—in order to make those prohibitions fully effective. E.g., City of Rome v. United States, 446 U.S. 156, 177–78, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); Varner v. Illinois State University, supra, 150 F.3d at 716–17. Military personnel are no more a discrete and insular minority than police or firemen. Rumsey v. New York State Dept. of Correctional Services, 19 F.3d 83, 92 (2d Cir.1994).

We are mindful that the Supreme Court said much the same thing about persons 50 years old and older in *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), yet that hasn't stopped us from holding that the Age Discrimination in Employment Act is authorized by section 5. *Goshtasby v. Board of Trustees, supra;* cf. *Varner v. Illinois State University* (Equal Pay Act); *Doe v. University of Illinois* (Title IX); *Alsbrook v. City of Maumelle,* 156 F.3d 825 (8th Cir.1998) (ADA); *Kimel v. Florida Board of Regents,* 139 F.3d 1426 (11th Cir. 1998) (same); *Coolbaugh v. Louisiana,* 136 F.3d 430 (5th Cir.1998) (same). Why then should we balk at USERRA? But the precise holding of *Murgia* was only that, because the aged are not *as* vulnerable as certain other groups, such as blacks, they are not entitled to have their claims of discrimination evaluated under the generous (to plaintiffs) standard of "strict scrutiny." The Court did not say or imply that discrimination on the basis of age cannot violate the equal protection clause. The age discrimination law (and, *mutatis mutandis,* the laws forbidding discrimination against women and against people with disabilities) is founded on the claim that older workers are disadvantaged because employers harbor negative stereotypes of older people, attributing to all of them the age-related working impairments of some. In *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court, after holding that the mentally retarded are not a group entitled to have their claims of discrimination judged under a heightened standard of review such as strict scrutiny, invalidated the denial of a permit for a home for mentally retarded persons as founded on "irrational prejudice against the mentally retarded." *Id.* at 450, 105 S.Ct. 3249.

Reserve members of the armed forces are not in a comparable position to the aged or the mentally retarded. There is little evidence that employers harbor a negative stereotype about military service or that Congress believes they do. It's not as if pacifism were part of the civil religion of the United States. In discussing a predecessor statute to USERRA, the Supreme Court made clear that the statute's main purpose was to encourage people to join the reserves. *Monroe v. Standard Oil Co.,* 452 U.S. 549, 557–60, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981); *id.* at 574–75, 101 S.Ct. 2510 (dissenting opinion); see also 38 U.S.C. § 4301(a)(1); *Gummo v. Village of Depew,* 75 F.3d 98, 104 (2d Cir. 1996); *Boyle v. Burke,* 925 F.2d 497, 502 (1st Cir.1991). The Court did not suggest that the purpose was to combat an ignorant or vicious stereotyping of reservists as undependable employees. This is at most a distinctly secondary purpose of USERRA. See 38 U.S.C. § 4301(a)(3); *Gummo v. Village of Depew, supra,* 75 F.3d at 107; *Diaz–Gandia v. Dapena–Thompson,* 90 F.3d 609, 616 (1st Cir.1996); cf. *Petersen v. Department of Interior,* 71 M.S.P.R. 227 (1996).

Our disbelief that USERRA can be regarded as having been enacted under the aegis of section 5 is supported by cases in the wake of *Seminole Tribe* that have refused to find a basis in that section for the federal minimum-wage law. E.g., *Abril v. Virginia,* 145 F.3d 182, 185–87 (4th Cir.1998); *Mills v. Maine, supra,* 118 F.3d at 43–49; *Raper v. Iowa,* 115 F.3d 623, 624 (8th Cir.1997). Paying someone less than the minimum wage creates an unlawful difference between him and higher-paid workers, but not a difference founded in stereotypical thinking or other signs of invidious discrimination. We need not consider the application of section 5 to statutes that protect rights related to the due process rather than equal protection clause of the Fourteenth Amendment. Compare *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, supra,* with *Chavez v. Arte Publico Press,* 157 F.3d 282 (5th Cir.1998).

■ The only constitutional basis of USERRA is thus the war power, which like the commerce power at issue in *Seminole Tribe* predates the Eleventh Amendment. The government, noting that the Supreme Court did not refer to the war power in *Seminole Tribe,* argues from *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 316–18, 57 S.Ct. 216, 81 L.Ed. 255 (1936), that the war power differs from the commerce power in not having been among the sovereign powers of the states before the Constitution was

promulgated. And this is indeed what *Curtiss–Wright* says—though quite possibly incorrectly. Charles A. Lofgren, a professional historian, in his article "United States v. Curtiss–Wright Export Corporation: An Historical Reassessment," 83 *Yale L.J.* 1, 32 (1973), pronounced the historical discussion in *Curtiss–Wright* "shockingly inaccurate." See generally Jack L. Goldsmith, "Federal Courts, Foreign Affairs, and Federalism," 83 *Va. L. Rev.* 1617, 1660 and n. 184 (1997). The government's lawyer conceded at argument that the historical analysis in the opinion is not a part of the Court's holding and so does not bind us.

We do not think that we need to engage with the historical controversy, and this for two reasons. The first, which we advance diffidently because it borders on heresy, is that judges do not have either the leisure or the training to conduct *responsible* historical research or *competently* umpire historical controversies. The term "law-office history" is properly derisory and the derision embraces the efforts of judges and law professors, as well as of legal advocates, to play historian. See Alfred H. Kelly, "Clio and the Court: An Illicit Love Affair," 1965 *S. Ct. Rev.* 119; Martin S. Flaherty, "History 'Lite' in Modern American Constitutionalism," 95 *Colum. L. Rev.* 523 (1995); Laura Kalman, "Border Patrol: Reflections on the Turn to History in Legal Scholarship," 66 *Fordham L. Rev.* 87 (1997); Barry Friedman & Scott B. Smith, "The Sedimentary Constitution," 147 *U. Pa. L. Rev.* 1 (1998). It is one thing for "originalists" to look up the eighteenth-century meaning of words, a type of historical research that is feasible for the amateur historian, whatever one may think of the merits of originalism as an interpretive methodology and however difficult it may be for originalists to resist the temptation to do ambitious historiography as well. See, e.g., *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219–25, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995); *Michael H. v. Gerald D.*, 491 U.S. 110, 128 n. 6, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion); *United States v. Lopez*, 514 U.S. 549, 584, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (concurring opinion); Akhil Reed Amar, "Our Forgotten Constitution: A Bicentennial Comment," 97 *Yale L.J.* 281

(1987). It is quite another thing for the nonhistorian to try to determine the powers claimed or exercised by the colonies and states in the founding era. Judges don't try to decide contested issues of science without the aid of expert testimony, and we fool ourselves if we think we can unaided resolve issues of historical truth.

This is not to deny the relevance of history to adjudication. It is to question the relevance of *contested* history to adjudication. The history narrated in *Curtiss–Wright* is contested, but fortunately it does not actually bear on the issue of sovereign immunity (and so on the Eleventh Amendment), which was not an issue in that case. Even if it is true that the states did not surrender their war powers to the federal government in the Constitution because they didn't have such powers (having previously surrendered them, according to *Curtiss–Wright*, to the Continental Congress), it doesn't follow that they surrendered any part of their sovereign immunity *from a suit seeking money from the state treasury*. That immunity is an independent attribute of sovereignty rather than an incident of the war power or of any other governmental power that a state might or might not have. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Seminole Tribe v. Florida, supra*, 517 U.S. at 54, 116 S.Ct. 1114. The subject matter of the suit to which the defense of sovereign immunity is interposed is thus irrelevant. *Id.* at 72–73, 116 S.Ct. 1114. It is enough that it is a suit against the state. The text of the Eleventh Amendment could not be much clearer on this point: "The judicial power of the United States shall not be construed to extend to *any* suit in law or equity, commenced or prosecuted against one of the United States" (emphasis added).

If we wanted to play historian, we would point out that it is highly uncertain whether, as *Hans* (see 134 U.S. at 12, 10 S.Ct. 504) and the cases following it suppose, the Eleventh Amendment was intended to restore an immunity that the states had enjoyed until it was held in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), to have been extinguished by Article III of the Constitution. The text itself suggests that the Elev-

enth Amendment merely limits diversity suits against states, and the suggestion is reinforced by the common law character of the doctrine of sovereign immunity and by evidence that the framers of the amendment wanted to protect the states against federal judges rather than against Congress. See, e.g., William A. Fletcher, "A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather Than a Prohibition Against Jurisdiction," 35 *Stan. L. Rev.* 1033 (1983); John J. Gibbons, "The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation," 83 *Colum. L. Rev.* 1889 (1983); Martha A. Field, "The Eleventh Amendment and Other Sovereign Immunity Doctrines, Part I," 126 *U. Pa. L. Rev.* 515 (1977); Laurence H. Tribe, "Intergovernmental Immunities in Litigation, Taxation, and Regulation," 89 *Harv. L. Rev.* 682, 683–99 (1976); see generally James E. Pfander, "History and State Suability: An 'Explanatory' Account of the Eleventh Amendment," 83 *Cornell L. Rev.* 1269 (1998). We needn't wade into these muddy waters. *Hans* and *Seminole Tribe* take one side of the historical controversy and by doing so have made it law, whatever law professors or even professional historians may say. These decisions point to the conclusion that legislation founded on the war power does not override state sovereign immunity.

■ Mindful, however, that the Constitution should not be interpreted as a national suicide pact, we asked the government's lawyer at argument what if any peril to the national defense will be created if suits such as the present are held barred by the Eleventh Amendment. He was unable to answer except in unconvincing generalities, and he made no representation that he was actually speaking for the Department of Defense. The Eleventh Amendment does not bar injunctive relief against state officers, *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), or suits for any sort of relief by the United States itself. *West Virginia v. United States*, 479 U.S. 305, 311 n. 4, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987). Congress recently passed a bill (which at this writing is awaiting signature by the President) that would add a new provision to USERRA, 38 U.S.C. § 4323(a), authorizing the United States to sue on behalf of victims of violations of the Act. Cf. 42 U.S.C. § 2000e–6. And since the Eleventh Amendment does not bar suits against states in state courts, *Nevada v. Hall*, 440 U.S. 410, 420–21, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), Velasquez could have brought his USERRA suit in an Indiana state court. Ind.Code §§ 34–13–3–1 *et seq.*; see, e.g., *Riggin v. Board of Trustees*, 489 N.E.2d 616 (Ind.App.1986). So there are plenty of alternatives to individual reservists' damages suits in federal district courts for enforcing USERRA.

An added wrinkle is that although the national guard is technically a part of the armed forces of the United States, it functions as a state militia except when activated for national service, which happens infrequently. The state therefore has a substantial interest in operating it efficiently. This makes less needful a full battery of private remedies against state discrimination against its personnel. In effect the state would be discriminating (if that is the right word, as we doubt) against itself.

Finally, there is much to be said for simplicity in law; it is a value to which American courts give too little weight. It's a lot simpler to have a rule that the Eleventh Amendment applies to all federal statutes based on Article I than to have to pick and choose among the numerous separate powers conferred on Congress by that article.

We are mindful that the First Circuit, in *DiazGandia v. Dapena–Thompson, supra*, 90 F.3d at 616 and n. 9, reached the opposite conclusion from ours. But its analysis is not convincing. The only reason it gave for its conclusion was that, prior to *Seminole Tribe*, it had held that the Eleventh Amendment was not a bar to a suit under a statute based on the war power, and because *Seminole Tribe* had not mentioned the war power that earlier First Circuit case could not be considered overruled. This is not a good reason—a lower court should reexamine its cases in light of the reasoning as well as the narrowest possible holding of a subsequent Supreme

Court decision—and it is not any reason at all in a circuit that has no previous case dealing with the issue, which is our situation. We side with *In re Sacred Heart Hospital*, 133 F.3d 237, 243 (3d Cir.1998), which implicitly but unmistakably (see *id.* at 245 (concurring opinion)) rejects *Diaz–Gandia*, holding as we do today that no legislation enacted under any provision of Article I can abrogate the sovereign immunity of the states.

The Eleventh Amendment is no bar to Velasquez's claim of national-origin discrimination, a claim founded on a statute (Title VII) that is clearly within the scope of section 5 of the Fourteenth Amendment. But as to that claim we have nothing to add to the district court's thorough discussion.

AFFIRMED.