A09A2213. ANSTADT v. BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA et al.
(693 SE2d 868)

PHIPPS, Judge.

Dr. Mark P. Anstadt sued the Board of Regents of the University System of Georgia, d/b/a Medical College of Georgia (hereafter MCG), and his supervisor, Dr. Kevin Landolfo, contending that he had been improperly terminated from his position as a cardiothoracic surgeon because of his military service, in violation of the Uniformed

---

Services Employment and Reemployment Rights Act of 1994[1] (USERRA) and OCGA § 38-2-279 (e).[2] Following the grant of summary judgment to both defendants,[3] Anstadt appeals. Finding no error, we affirm.

To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judgment as a matter of law.[4] We review de novo a trial court's grant of summary judgment, construing the evidence in a light most favorable to the nonmoving party.[5]

So viewed, the evidence was that Anstadt was hired by MCG as a cardiothoracic surgeon in July 2000. He was hired on the recommendation of Dr. Lionel Zumbro, then chief of the section of Cardiothoracic Surgery. Around the same time, Zumbro also hired Dr. Kwabena Mawulawde, another cardiothoracic surgeon. Shortly thereafter, Anstadt was appointed to be an associate director of the Thoracic Surgery Residency Training program.

In 2001, MCG commissioned a study to evaluate its cardiovascular services because it was not receiving enough cardio surgical cases, was not making enough money, and believed it was not perceived as prestigious enough. The study recommended that MCG obtain new leadership for the section of Cardiothoracic Surgery and revamp the section with the goal of becoming a Cardiovascular Center of Excellence. On October 15, 2001, Zumbro notified MCG that he was resigning as chief of Cardiothoracic Surgery, and he also tendered his resignation as a faculty member on March 19, 2002. Both resignations were effective June 30, 2002.

On April 18, 2002, Dr. David Stern became dean of the School of Medicine at MCG. Part of his charge from the president of MCG upon his hiring was to develop Centers of Excellence in cardiovascular services, neurosciences, and cancer services. With regard to filling the position of chief of Cardiothoracic Surgery, Stern shifted the focus of the search committee from pediatric cardiothoracic surgeons

---

[1] 38 USC § 4311 et seq.

[2] Suit was originally filed in federal district court, dismissed without prejudice to refile in state court, and then filed in Richmond County Superior Court.

[3] None of the enumerations of error specifically addresses the trial court's grant of summary judgment to Landolfo. Even if we assume that Anstadt's sixth enumeration of error regarding denial of mandamus relief includes Landolfo, the trial court correctly concluded that, having waited five years after Landolfo's alleged failure to perform a ministerial act to seek mandamus, Anstadt's claim for mandamus relief failed as untimely. *Britton v. Regus*, 270 Ga. 313, 314 (509 SE2d 918) (1998); *Atlanta Independent School System v. Lane*, 266 Ga. 657, 660 (6) (469 SE2d 22) (1996).

[4] OCGA § 9-11-56 (c); *Latson v. Boaz*, 278 Ga. 113-114 (598 SE2d 485) (2004).

[5] *Latson*, supra.

to cardiothoracic surgeons who possessed certain leadership skills as he defined them. Stern also favored hiring from outside MCG instead of from within.

Also, in the spring of 2002, MCG hired Dr. Stephen Schwab from Duke University as the chairman of the Department of Medicine. Schwab mentioned to Stern, as a candidate for chief of Cardiothoracic Surgery, Dr. Kevin Landolfo, whom Schwab described as a star and go-getter at Duke. Following Landolfo's first round of interviews, Stern asked him to prepare a plan outlining his vision for the section of Cardiothoracic Surgery. In response, on January 21, 2003, Landolfo sent Stern his five-year plan for the section. The plan sought to recruit faculty with specialized clinical skill sets not then present at MCG and who also fit into MCG's desire to transform the existing section into a Center of Excellence recognized nationally. Landolfo was brought back for a second set of interviews and offered the position.

During his discussions with MCG in early 2003, Landolfo made it clear that one of his requirements was the ability to bring in his own people and have the capacity not to renew the contracts of any of the then-current MCG faculty in his section, including Anstadt. On March 15, 2003, Landolfo signed a Memorandum of Understanding with MCG. The memorandum was dated March 4, 2003, and it included a clause stating that renewal of contracts of current surgeons would be at the "discretion of the Chief [Landolfo]" and that the "Chairman of the Department of Surgery will notify current CT Surgery Faculty by September 2003 that their contracts will not be renewed for the fiscal year 2005."

On March 6, 2003, Anstadt was ordered to active duty by the United States Army as part of his commitment to the Army Reserve. It is undisputed that, during his deployment, Anstadt used his annual leave with MCG and continued to receive his full salary from MCG. He returned to MCG from active duty on June 2, 2003, and was informally told by Dr. Thomas Gadacz, chairman of the Department of Surgery, that he was no longer in the plans for MCG's future. Landolfo started work at MCG on July 1, 2003.

Anstadt continued to work for MCG until June 30, 2004, when his last contract expired and was not renewed. Dr. Mawulawde's contract was also not renewed and, because he was part-time faculty, he was given four months notice of his termination. Anstadt obtained new employment as a thoracic surgeon and was allowed to begin working for his new employer two months before his MCG contract expired, thereby earning two salaries for that period.

Following discovery, the trial court granted the motions for summary judgment of MCG and Landolfo on Anstadt's claims for monetary damages and mandamus relief.

486

1. Anstadt's first enumeration of error is that the trial court erred in granting summary judgment on the basis of sovereign immunity in that USERRA is a valid abrogation of the state's sovereign immunity under the Eleventh Amendment because it was enacted under the congressional power to regulate the militia, raise an army, or to "make all Laws which shall be necessary and proper for carrying into [E]xecution" its power to do so.

As originally enacted, USERRA provided for a federal cause of action against state governments for violations of its provisions.[6] This provision of the earlier statute was held to violate the Eleventh Amendment by several courts.[7] In response, Congress amended USERRA in 1998 to provide that the United States Attorney General may appear on behalf of the claimant "and commence an action for relief under [38 USC § 4301 et seq.] for such person. *In the case of such an action against a State (as an employer), the action shall be brought in the name of the United States as the plaintiff in the action.*"[8]

In this way, the amended statute avoids the Eleventh Amendment issue by creating a cause of action in favor of the United States on behalf of the member of the military against the state employer. In this case, no such claim on behalf of Anstadt was made by the Attorney General. USERRA, alternatively, provides that "an action against a State (as an employer) by a person . . . *may* be brought in a State court of competent jurisdiction *in accordance with the laws of the State.*"[9]

Anstadt argues, based on *Central Virginia Community College v. Katz*,[10] that this statutory language constitutes an abrogation of Georgia's sovereign immunity from a USERRA claim because the framers of the Constitution intended to vest war powers solely with Congress. This argument, however, was not raised below.

As stated by the Supreme Court of Georgia in *Pfeiffer v. Ga. Dept. of Transp.*,[11]

> our appellate courts are courts for the correction of errors of law committed in the trial court. Routinely, this Court refuses to review issues not raised in the trial court. To

---

[6] See *Velasquez v. Frapwell*, 160 F3d 389, 391 (7th Cir. 1998), vacated in part, 165 F3d 593 (7th Cir. 1999) (vacating holding due to passage of USERRA amendment which conferred on state courts jurisdiction over suits against state employers).

[7] See, e.g., id. at 394; *Forster v. SAIF Corp.*, 23 FSupp.2d 1196, 1197 (D. Ore. 1998); *Palmatier v. Michigan Dept. of State Police*, 981 FSupp. 529, 531-532 (III) (W.D. Mich. 1997).

[8] 38 USC § 4323 (a) (1) (emphasis supplied).

[9] 38 USC § 4323 (b) (2) (emphasis supplied).

[10] 546 U. S. 356 (126 SC 990, 163 LE2d 945) (2006).

[11] 275 Ga. 827 (573 SE2d 389) (2002).

consider the case on a completely different basis from that presented below would be contrary to the line of cases holding, "He must stand or fall upon the position taken in the trial court." Fairness to the trial court and to the parties demands that legal issues be asserted in the trial court. If the rule were otherwise, a party opposing a motion for summary judgment need not raise any legal issue, spend the next year thinking up and researching additional issues for the appellate court to address, and require the opposing party to address those issues within the narrow time frame of appellate practice rules. Therefore, absent special circumstances, an appellate court need not consider arguments raised for the first time on appeal.[12]

Pretermitting Anstadt's failure to raise this argument below, we note that the holding in *Katz* is narrowly limited to bankruptcy cases.

In the case of bankruptcy, it is "not necessary [for Congress] to authorize the Bankruptcy Court's jurisdiction" because, in ratifying the Bankruptcy Clause, the states "agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to 'Laws on the subject of Bankruptcies.' "[13]

The trial court correctly concluded that Anstadt's suit against MCG under USERRA in state court is precluded by the Eleventh Amendment. Anstadt's argument that the enactment of USERRA abrogated the state's sovereign immunity because it was enacted pursuant to Congress's war powers is unavailing.[14]

2. We next consider Anstadt's fourth enumeration of error that the trial court erred in failing to find that the Georgia legislature waived sovereign immunity as a defense to USERRA by passage of OCGA § 38-2-279. Finding of such a waiver would have allowed him

---

[12] Id. at 829 (2) (punctuation and footnotes omitted).

[13] *St. Charles County v. Wisconsin*, 447 F3d 1055, 1058, n. 4 (8th Cir. 2006), quoting *Katz*, supra at 377.

[14] *Alden v. Maine*, 527 U. S. 706, 712 (119 SC 2240, 144 LE2d 636) (1999) (federal Fair Labor Standards Act did not abrogate the states' sovereign immunity); *Seminole Tribe of Florida v. Florida*, 517 U. S. 44, 59-60 (116 SC 1114, 134 LE2d 252) (1996) (Congress cannot generally abrogate state sovereign immunity using powers authorized prior to the enactment of the Fourteenth Amendment, including war powers); *Townsend v. Univ. of Alaska*, 543 F3d 478, 483-485 (9th Cir. 2008) (Congress did not unequivocally express an intent to abrogate the states' sovereign immunity in USERRA).

to proceed in state court under 38 USC § 4323 (b) (2) because his suit under USERRA would have been brought "in accordance with the laws of the State."

OCGA § 38-2-279 provides, in pertinent part, that a *public* officer or employee "shall be paid his . . . salary or other compensation as such public officer or employee for any and all periods of absence while engaged in the performance of ordered military duty . . . not exceeding a total of 18 days in any one federal fiscal year."[15] Enacted at the same time was OCGA § 38-2-280, which provides that any *private* employer who fails to restore an employee to the position held prior to military service may be subjected to suit in superior court seeking injunctive relief and may also be ordered to "compensate the person for any loss of wages or benefits suffered by reason of the employer's unlawful action."[16]

Anstadt's claim that enactment of OCGA § 38-2-279 waived sovereign immunity is unavailing.

> "The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). See also *Gilbert v. Richardson*, 264 Ga. 744, 748 (3) (452 SE2d 476) (1994) ("we hold that sovereign immunity is waived by any legislative act which *specifically* provides that sovereign immunity is waived *and* the extent of such waiver") (emphasis supplied); OCGA § 33-24-51. In this regard, "[i]mplied waivers of governmental immunity should not be favored." (Citation omitted.) *City of Atlanta v. Gilmere*, 252 Ga. 406, 409 (314 SE2d 204) (1984); cf. *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 682 (IV) (119 SC 2219, 144 LE2d 605) (1999) ("'[W]aivers [of sovereign immunity] are not [to be] implied" in the context of State allowing itself to be sued in federal court).[17]

As noted above, two provisions were enacted by the General Assembly regarding protection of reservists' employment upon return from service, one for public employers and one for private employers. Only OCGA § 38-2-280, dealing with private employers,

---

[15] As stated above, Anstadt was paid by MCG during his military deployment through use of his annual leave.

[16] OCGA § 38-2-280 (f).

[17] *Currid v. DeKalb State Court Probation Dept.*, 285 Ga. 184, 186-187 (674 SE2d 894) (2009).

specifically provides for a suit seeking injunctive and compensatory relief. The absence of similar language with regard to the public employer supports the trial court's conclusion that the General Assembly did not intend to create a cause of action for damages against the state or otherwise waive its immunity by enacting OCGA § 38-2-279.[18] This conclusion is also supported by the maxim that the General Assembly is presumed to know what the courts have held the law to be on a particular subject, such as the waiver of sovereign immunity, and enacts laws in light of these holdings.[19]

Anstadt's reliance on *Williamson v. Dept. of Human Resources*[20] in support of his argument is misplaced. In that case, a disabled worker sued the Department of Human Resources and Georgia Regional Hospital, claiming violations of the federal Americans with Disabilities Act[21] and Rehabilitation Act.[22] A specific statute, the Georgia Fair Employment Practices Act (FEPA), created a right of action against the state, as an employer, for discrimination on the basis, inter alia, of an employee's disability.[23] Because an action under FEPA could result in a judgment for back pay and other actual damages,[24] this Court found that the state, by legislative act, specifically waived its sovereign immunity for actions authorized by FEPA.[25] No such statute creates a cause of action in Anstadt's situation.

3. Based on our holdings in Divisions 1 and 2, we need not consider Anstadt's remaining enumerations of error.

*Judgment affirmed. Smith, P. J., and Bernes, J., concur.*

DECIDED MARCH 25, 2010 —
RECONSIDERATION DENIED APRIL 7, 2010 — 

*John M. Brown*, for appellant.
*Hull & Barrett, Alana R. Kyriakakis, William J. Keogh III*, for appellees.

---

[18] Id.; *Norton v. Cobb*, 284 Ga. App. 303, 306 (1) (643 SE2d 803) (2007).
[19] *Margeson v. Givens*, 231 Ga. 552, 553 (203 SE2d 186) (1974).
[20] *Williamson v. Dept. of Human Resources*, 258 Ga. App. 113 (572 SE2d 678) (2002).
[21] 42 USC § 12101 et seq.
[22] 29 USC § 701 et seq.
[23] OCGA §§ 45-19-21 (a) (3); 45-19-36 (b); 45-19-39 (a).
[24] OCGA §§ 45-19-38 (b), (d); 45-19-40.
[25] *Williamson*, supra at 116.