**Certiorari Granted, May 1, 2014, NO. 34,613**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-057**

**Filing Date: March 3, 2014**

**Docket No. 31,820**

**PHILLIP G. RAMIREZ, JR.,**

**Plaintiff-Appellee/Cross-Appellant,**

**v.**

**STATE OF NEW MEXICO ex rel. CHILDREN,**
**YOUTH AND FAMILIES DEPARTMENT,**
**DORIAN DODSON, in her individual and official capacities,**
**RON WEST, in his individual and official capacities,**
**BARBARA AUTEN, in her individual and official capacities,**
**ROGER GILLESPIE, in his individual and official capacities,**
**TED LOVATO, in his individual and official capacities,**
**TIM HOLESINGER, in his individual and official capacities, and**
**DANIEL BERG, in his individual and official capacities,**

**Defendants-Appellants/Cross-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF McKINLEY COUNTY**
**Camille Martinez-Olguin, District Judge**

Vega Lynn Law Offices, LLC
Rosario D. Vega Lynn
Albuquerque, NM

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

for Appellee/Cross-Appellant

Hinkle, Hensley, Shanor & Martin, L.L.P.
Ellen S. Casey
Jaclyn M. McLean

Santa Fe, NM

for Appellants/Cross-Appellees

The Reserve Officers Association of America
Samuel F. Wright
Washington, D.C.

Law Office of Thomas G. Jarrard, PLLC
Thomas G. Jarrard
Spokane, WA

Struebel Kochersberger Mortimer LLC
David A. Streubel
Albuquerque, NM

for Amicus Curiae The Reserve Officers Association of America

Legal Panel Member, ACLU-NM
Matthew L. Garcia
Albuquerque, NM

for Amicus Curiae American Civil Liberties Union

Damon Martinez, United States Attorney
Manuel Lucero, Assistant U.S. Attorney
Albuquerque, NM

Office of the Solicitor
M. Patricia Smith, Solicitor of Labor
Washington, D.C.

Department of Justice/Appellate Section
Thomas E. Perez, Assistant Attorney General
Nathaniel S. Pollock
Jessica Dunsay Silver
Washington, D.C.

for Amicus Curiae United States

## OPINION

**FRY, Judge.**

**{1}** Plaintiff, a member of the New Mexico National Guard, filed suit pursuant to the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4301 to 4335 (1994, as amended through 2011), against his former employer, the New Mexico Children, Youth, and Families Department (CYFD), following his termination. The issue presented by this appeal is whether CYFD, as an arm of the State, is entitled to constitutional state sovereign immunity in regard to Plaintiff's claim. Because we determine that Congress cannot override a state's sovereign immunity when acting pursuant to its war powers and because the New Mexico Legislature has not waived the State's sovereign immunity for USERRA suits, we conclude that CYFD is immune from Plaintiff's claim and accordingly reverse the district court's contrary determination.

## BACKGROUND

**{2}** Plaintiff began working for CYFD as a community support officer in 1997. At that time, Plaintiff had been a member of the New Mexico National Guard for approximately six years. Plaintiff continued his military service throughout his term of employment with CYFD and, in 2005, Plaintiff was deployed to Iraq.

**{3}** By all accounts, Plaintiff served admirably while deployed. Upon his return from active duty, Plaintiff was re-employed by CYFD in his previous position. Plaintiff testified that soon after his return, his new supervisors began harassing him. His allegations of harassment included claims that supervisors placed unrealistic goals on his employment responsibilities, initiated unnecessary disciplinary action against him, and leveled unfounded charges of insubordination. Plaintiff voiced his complaints of harassment with both his supervisors and those higher in the CYFD chain of command. However, Plaintiff's working relationship with his supervisors continued to deteriorate, and he was placed on administrative leave and subsequently terminated in the spring of 2008.

**{4}** Plaintiff brought suit against CYFD alleging, in part, that he was discriminated against and wrongfully terminated because of his military service, in contravention of USERRA, 38 U.S.C. § 4311. CYFD argued on multiple occasions throughout the proceedings that, as a state agency, it was immune to USERRA claims by private individuals. The district court rejected CYFD's argument, and the case proceeded to trial, where Plaintiff succeeded in his USERRA claim and was awarded damages. CYFD now appeals.

## DISCUSSION

**{5}** The primary issue in this appeal is whether constitutional state sovereign immunity, as recognized by *Seminole Tribe of Florida v. Florida* and its progeny, precludes Plaintiff's USERRA claim against CYFD. 517 U.S. 44 (1996) (holding that Congress cannot subject non-consenting states to suit in federal court when acting under its Article I powers); *Alden v. Maine*, 527 U.S. 706 (1999) (holding that Congress cannot use its Article I powers to subject non-consenting states to suit in state court). This determination rests on two

inquiries: (1) whether Congress has the authority to subject a state to a USERRA suit by a private individual in the state's own courts and, (2) if not, whether New Mexico has waived sovereign immunity for USERRA claims and therefore consented to suit. We address these issues in turn.

**Standard of Review**

**{6}** "We review de novo the validity of a claim of sovereign immunity." *State ex rel. San Miguel Bd. of Cnty. Comm'rs v. Williams*, 2007-NMCA-036, ¶ 20, 141 N.M. 356, 155 P.3d 761. Furthermore, to the extent that issues in this case require us to interpret statutory language, interpretation of a statute is a question of law that we review de novo. *Morgan Keegan Mortg. Co. v. Candelaria*, 1998-NMCA-008, ¶ 5, 124 N.M. 405, 951 P.2d 1066.

**Congress Does Not Have the Authority to Subordinate State Sovereign Immunity Under the War Powers Clause**

**{7}** Our Supreme Court has previously discussed the United States Supreme Court's controversial recognition of constitutional state sovereign immunity and the impact of the *Seminole Tribe* line of cases on Congress's authority to permit private suits for damages against non-consenting states. *See State ex rel. Hanosh v. State ex rel. King*, 2009-NMSC-047, ¶ 6, 147 N.M. 87, 217 P.3d 100 ("As a principle of federalism, constitutional sovereign immunity circumscribes the power of the U.S. Congress to create statutory rights and enforce them against the states absent their consent." (emphasis omitted)); *Gill v. Pub. Emps. Ret. Bd. of Pub. Emps. Ret. Ass'n. of N.M.*, 2004-NMSC-016, ¶¶ 5-6, 135 N.M. 472, 90 P.3d 491 (discussing the principles of federalism underlying the United States Supreme Court's decision in *Seminole Tribe*); *see also Cockrell v. Bd. of Regents*, 2002-NMSC-009, ¶¶ 4-8, 132 N.M. 156, 45 P.3d 876. Rather than reiterate the development of the constitutional sovereign immunity doctrine, we begin instead by discussing the history of USERRA in relation to the evolution of this jurisprudence.

**{8}** USERRA was enacted by Congress with the stated purpose of "encourag[ing] noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service." 38 U.S.C. § 4301(a)(1). In addition to "providing for the prompt reemployment of [service members] upon their completion of such service," USERRA aims to fulfill its goal by "prohibit[ing] discrimination against persons because of their service in the uniformed services." Section 4301(a)(2), (3). Because the purpose of USERRA is to encourage military service, it is generally accepted—and undisputed by the parties in this case—that it was enacted pursuant to Article I, Section 8, Clause 11 of the United States Constitution, also known as the War Powers Clause. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 843-44 (7th Cir. 2005).

**{9}** USERRA originally provided for federal court jurisdiction over suits brought by private individuals against state employers. *See* USERRA, Pub. L. No. 103-353, § 2(a)(c)(1)(A) 108 Stat. 3149, 3165 (1994) (current version at 38 U.S.C. § 4323(b)(1)

(2008)) (providing that "[t]he district courts of the United States shall have jurisdiction" over all USERRA actions, including suits against a state employer). However, the United States Supreme Court's decision in *Seminole Tribe* cast significant doubt on Congress's authority to subject states to USERRA suits by private individuals in federal court.[1] *Seminole Tribe*, 517 U.S. at 45 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."); *see Palmatier v. Mich. Dep't of State Police*, 981 F. Supp. 529, 532 (W.D. Mich. 1997) ("Applying the lesson of *Seminole Tribe*, it necessarily follows that Congress, acting under Article I, could not effectively abrogate the states' Eleventh Amendment immunity in USERRA [as originally enacted]."). Congress, therefore, in an apparent attempt to provide an alternative avenue of relief for private individuals seeking to enforce rights under USERRA against state employers, amended USERRA in 1998 to provide that "[i]n the case of an action against a [s]tate (as an employer) by a person, the action may be brought in a [s]tate court of competent jurisdiction in accordance with the laws of the [s]tate." 38 U.S.C. § 4323(b)(2).

{10}     Soon after USERRA was amended to purportedly vest jurisdiction in state courts for private suits against state employers, the United States Supreme Court, in *Alden*, extended its holding in *Seminole Tribe* when it addressed the corollary question of whether Congress could subject non-consenting states to suit in state court. The Court held that it could not. *Alden*, 527 U.S. at 712 ("We hold that the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject non[-]consenting [s]tates to private suits for damages in state courts."). In framing the issue, the Court examined whether there was "compelling evidence" that "Congress may subject the [s]tates to private suits in their own courts" pursuant to its Article I powers by virtue of "constitutional design." *Id.* at 730-31 (internal quotation marks omitted). The Court stated:

> [A]s the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the [s]tates' immunity from suit is a fundamental aspect of the sovereignty which the [s]tates enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the Convention or certain constitutional Amendments.

*Id.* at 713. The Court ultimately concluded that "[i]n light of history, practice, precedent, and the structure of the Constitution, we hold that the [s]tates retain immunity from private suit in their own courts, an immunity beyond the congressional power to abrogate by Article I legislation." *Id.* at 754. Following *Alden*, it therefore appeared settled that Congress could not override a state's constitutional sovereign immunity when acting under its Article I

---

[1]The current version of USERRA does provide for federal court jurisdiction over suits brought by the United States against a state on behalf of an individual. 38 U.S.C. 4323(a)(1). It appears from the record that the United States denied Plaintiff's request to undertake his case.

powers. *See, e.g.*, *Manning v. N.M. Energy, Minerals & Natural Res. Dep't*, 2006-NMSC-027, ¶ 24, 140 N.M. 528, 144 P.3d 87 ("*Alden* and its progeny stand for the proposition that state constitutional sovereign immunity bars individual claims for damages that are based on legislation passed by Congress pursuant to its Article I powers."). Thus, *Alden* invalidated Congress's attempt to sidestep *Seminole Tribe* by amending USERRA to provide for state court jurisdiction over private suits against state employers.

**{11}** However, the apparent clarity of *Seminole Tribe* and *Alden* was soon shaken by the Court's opinion in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006). In *Katz*, the Court held that sovereign immunity did not bar an adversary proceeding in bankruptcy court to set aside the bankruptcy petitioner's alleged preferential transfers to the state. *Id.* at 359. In a seeming retreat from the more definitive language of *Seminole Tribe* and *Alden*, the Court characterized as an "erroneous" assumption the notion that *Seminole Tribe*'s holding would apply to the Article I Bankruptcy Clause. *Katz*, 546 U.S. at 363; *see* U.S. Const. art. 1, § 8, cl. 4 (providing that Congress shall have the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States"). While the Court was careful to note that *in rem* jurisdiction and proceedings ancillary to a bankruptcy court's exercise of its *in rem* jurisdiction do not generally interfere with a state's sovereign immunity, *Katz*, 546 U.S. at 369-73, it further stated that to the extent such jurisdiction does interfere with a state's sovereign immunity, the "States agreed in the plan of the Convention not to assert that immunity." *Id.* at 373; *see id.* at 362-63 ("The history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation both proposed and enacted under its auspices immediately following ratification of the Constitution demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena."). In ruling that at least one Article I power can provide a basis for subjecting states to suit despite statements in *Seminole Tribe* and *Alden* to the contrary, the Supreme Court's decision in *Katz* has raised questions as to whether, in the "plan of the Convention," the states may have agreed to waive sovereign immunity in the context of other Article I powers. *Katz*, 546 U.S. at 373; *see* Joseph M. Pellicciotti & Michael J. Pellicciotti, *Sovereign Immunity & Congressionally Authorized Private Party Actions Against the States for Violation of Federal Law: A Consideration of the U.S. Supreme Court's Decades Long Decisional Trek, 1996-2006*, 59 Baylor L. Rev. 623, 642 (2007) ("The Court did not overrule *Seminole Tribe* in the *Katz* decision. . . . [However,] it remains to be seen if the Court would undertake a similar course of study and reflection and, as it did in *Katz* end up refusing to follow its *Seminole Tribe* 'dicta' in future Article I case settings.").

**{12}** It is within the ambiguity created by *Katz* that Plaintiff roots his argument that Congress has authority pursuant to the War Powers Clause to subject states to suit under USERRA.[2] Plaintiff directs us to various sources establishing the unique and exclusive

---

[2]Amicus briefs in support of Plaintiff were filed by both the Department of Justice and the Reserve Officers Association of America in partnership with the American Civil

nature of Congress's war powers and, using this historical context, seeks to analogize to the historical evidence of the exclusivity of Congress's bankruptcy powers that the Court so heavily relied on in *Katz*. *See Katz*, 546 U.S. at 364-370 (discussing the "difficulties posed by [the] patchwork of insolvency and bankruptcy laws . . . peculiar to the American experience" and the need to establish a uniform federal response embodied by the Bankruptcy Clause). Important to an understanding of the historical context of Congress's war powers, Plaintiff posits, is the recognition by the Founders that, while sovereign immunity is a key attribute of sovereignty, the Founders envisioned that state sovereignty could be surrendered by an exclusive delegation of power to the federal government, taking with it a state's immunity to suit. *See The Federalist No. 81*, at 422 (Alexander Hamilton) (Gideon ed. 2001) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. . . . Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states[.]" (emphasis omitted)); *The Federalist No. 32*, at 155 (Alexander Hamilton) (Gideon ed. 2001) ("[A]s the plan of the convention aims only at a partial union or consolidation, the state governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, exclusively delegated to the United States." (emphasis omitted)). Thus, Plaintiff argues, because the Constitution delegated exclusive war powers authority to the national government, the states never exercised, much less retained, sovereignty in this arena and, therefore, they enjoy no corresponding immunity.[3] *See Lichter v. United States*, 334 U.S. 742, 781 (1948) ("[T]he power has been expressly given to Congress to prosecute war, and to pass all laws which shall be necessary and proper for carrying that power into execution.").

{13}   We do not agree with Plaintiff's argument. As explained below, there are key differences between the War Powers Clause and both the subject matter of the Bankruptcy Clause and the historical evidence underlying the Court's decision in *Katz*. We therefore conclude that the War Powers Clause does not authorize Congress to subject the State to private USERRA suits for damages in our state courts, absent the State's consent.

{14}   Principal among these differences is the unique nature of bankruptcy jurisdiction in relation to state sovereign immunity, as discussed in *Katz*. The Court explained that "[b]ankruptcy jurisdiction, as understood today and at the time of the framing, is principally *in rem* jurisdiction" and, "[a]s such, its exercise does not, in the usual case, interfere with

---

Liberties Union. For convenience, references to Plaintiff's arguments may include those arguments made by Amici on behalf of Plaintiff.

[3]Because Plaintiff primarily argues that the states never exercised or retained sovereignty in regard to war powers, we do not address the parties' arguments concerning whether USERRA contains an explicit attempt by Congress to abrogate state sovereign immunity. If the states never exercised or retained sovereignty in this arena, as Plaintiff argues, then there would be no sovereign immunity to abrogate.

state sovereignty even when [s]tates' interests are affected." *Katz*, 546 U.S. at 369-70. Thus, unlike other Article I powers, "the Bankruptcy Clause . . . simply [does] not contravene the norms [the U.S. Supreme Court] has understood the Eleventh Amendment to exemplify." *Id.* at 375; *see id.* at 378 ("The scope of this consent was limited; the jurisdiction exercised in bankruptcy proceedings was chiefly *in rem*—a narrow jurisdiction that does not implicate state sovereignty to nearly the same degree as other kinds of jurisdiction."). This difference alone counsels against extending the Court's rationale in *Katz* to recognize congressional authority to override state sovereign immunity under other Article I powers, such as the War Powers Clause. *See Anstadt v. Bd. Regents of Univ. Sys. of Ga.*, 693 S.E.2d 868, 871 (Ga. Ct. App. 2010) (refusing to extend the rationale of *Katz* to recognize congressional authority to abrogate state sovereign immunity under the War Powers Clause); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of Univ. Sys. of Ga.*, 633 F.3d 1297, 1314 (11th Cir. 2011) (rejecting argument that *Katz*'s rationale should be extended to the Copyright and Patent Clause in stating, "[t]he holding in *Katz* is carefully circumscribed to the bankruptcy context; its analysis is based upon the history of bankruptcy jurisdiction").

**{15}**     Furthermore, Plaintiff's argument—that an exclusive delegation of war powers to the national government is sufficient to recognize a waiver of state sovereign immunity by constitutional design—is unpersuasive for two additional reasons. First, Plaintiff's argument essentially revives a prior understanding of the nature of congressional authority to abrogate state sovereign immunity, which was overruled in *Seminole Tribe*. *See Pa. v. Union Gas Co.*, 491 U.S. 1, 19-20 (1989) ("Because the Commerce Clause withholds power from the [s]tates at the same time as it confers it on Congress, and because the congressional power thus conferred would be incomplete without the authority to render [the s]tates liable in damages, it must be that, to the extent that the [s]tates gave Congress the authority to regulate commerce, they also relinquished their immunity where Congress found it necessary, in exercising this authority, to render them liable."), *overruled by Seminole Tribe*, 517 U.S. 44. In *Seminole Tribe*, the Court explicitly rejected the idea that a delegation of power, by itself, was sufficient to abrogate state sovereign immunity:

> In overruling *Union Gas* today, we reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government. Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting [s]tates.

*Seminole Tribe*, 517 U.S. at 72. *Katz* did not purport to overrule *Seminole Tribe*, and the Court's holding in *Seminole Tribe* strongly undercuts Plaintiff's argument.

**{16}**     Second, while *Katz*'s analysis began with the recognition that the states agreed to an

exclusive delegation of power to Congress to legislate in the arena of bankruptcy, this was not the definitive point of the Court's analysis. Instead, the states' recognition in the "plan of the Convention" that this entailed a subordination of their sovereignty led the Court to the "ineluctable conclusion" that the states agreed not to assert the defense of sovereign immunity in bankruptcy proceedings. *See Katz*, 546 U.S. at 377 ("[T]he power to enact bankruptcy legislation was understood to carry with it the power to subordinate state sovereignty, albeit within a limited sphere."). It was therefore not the exclusive delegation of power to Congress itself that justified a limited subordination of state sovereignty, but rather an understanding among the states, as evidenced by the history of bankruptcy jurisdiction, that an exclusive delegation of this power to Congress inherently included a subordination of their sovereignty to accomplish its purposes. *Id.* at 377-78 ("[T]he Framers, in adopting the Bankruptcy Clause, plainly intended to give Congress the power to redress the rampant injustice resulting from [the s]tates' refusal to respect one another's discharge orders. . . . In ratifying the Bankruptcy Clause, the [s]tates acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts.").

**{17}** In our view, this same justification does not exist in the context of Congress's war powers. While it is clear that the centralization of war powers in the national government served important interests, it is unlikely that the states, in ratifying the Constitution, would have considered that these powers would be effectuated by a subordination of their sovereign immunity to the extent of permitting private suits for damages against the states. *Cf. Velasquez v. Frapwell*, 160 F.3d 389, 393 (7th Cir. 1998) ("Even if it is true that the states did not surrender their war powers to the federal government in the Constitution because they didn't have such powers . . . it doesn't follow that they surrendered any part of their sovereign immunity *from a suit seeking money from the state treasury*. That immunity is an independent attribute of sovereignty rather than an incident of the war power[.]"). And, without evidence that the states would have considered the delegation of war powers to the national government to inherently include their amenability to private suits for damages, we are reticent to conclude that the states acquiesced in the plan of the Convention to a subordination of their sovereign immunity under this Article I power. *See Katz*, 546 U.S. at 362-63 (stating that the Bankruptcy Clause was intended "not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena").

**{18}** In sum, while the Supreme Court appeared to backtrack in *Katz* on earlier dicta that no Article I power could provide a valid basis to override state sovereign immunity, it did so on a narrow basis justified by the unique history of bankruptcy jurisdiction. *See Risner v. Ohio Dep't of Rehab. & Corr.*, 577 F. Supp. 2d 953, 963 (N.D. Ohio 2008) ("Although the Supreme Court determined in *Katz* that the states waived sovereign immunity in bankruptcy proceedings by ratifying Congress'[s] Article I powers, the Court stressed that the exception for bankruptcy cases is a narrow one."). The Supreme Court has thus far not recognized any Article I authority that permits the subordination of state sovereign immunity for private suits for damages against states. *See Coleman v. Court of Appeals of Md.*, 132

S. Ct. 1327, 1333 (2012) ("A foundational premise of the federal system is that [the s]tates, as sovereigns, are immune from suits for damages[.] . . . As an exception to this principle, Congress may abrogate the [s]tates' immunity from suit pursuant to its powers under § 5 of the Fourteenth Amendment." (citations omitted)). More importantly, in the context of a purported subordination of state sovereign immunity in state court pursuant to a federal cause of action, the Supreme Court's decision in *Alden* forecloses such a possibility, *Katz* notwithstanding. *See Alden*, 527 U.S. at 739-40 ("[T]he Constitution reserves to the [s]tates a constitutional immunity from private suits in their own courts which cannot be abrogated by Congress."); *Manning*, 2006-NMSC-027, ¶ 24 (restating in the wake of *Katz* that constitutional sovereign immunity bars private suits for damages based on legislation pursuant to Congress's Article I powers).

**The State has Not Consented to Private USERRA Suits for Damages**

**{19}**    Because we have determined that Congress did not have the authority to subject the State to a private USERRA suit for damages by virtue of constitutional design, we now address Plaintiff's argument that the New Mexico Legislature has consented to such suits through the enactment of various statutes regarding the military and service member rights. *See Alden*, 527 U.S. at 737 (noting the "general proposition that a [s]tate may waive its sovereign immunity and consent to suit"); *Cockrell*, 2002-NMSC-009, ¶ 13 ("[I]t is within the sole province of the Legislature to waive the [s]tate's constitutional sovereign immunity."). Contrary to Plaintiff's argument, we conclude that the statutes relied on by Plaintiff do not meet the requisite specificity required to determine that the Legislature has intended to waive the State's constitutional sovereign immunity to private USERRA suits for damages.

**{20}**    A state's waiver of its constitutional sovereign immunity must be "unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *see Edelman v. Jordan*, 415 U.S. 651, 673 (1974) ("[W]e will find waiver only where stated by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction." (internal quotation marks and citation omitted)). Our Supreme Court has previously expressed a reluctance to infer a waiver of constitutional sovereign immunity due to the "vital role of the doctrine of sovereign immunity in our federal system." *Cockrell*, 2002-NMSC-009, ¶ 20 (internal quotation marks and citation omitted). Therefore, "any waiver of the [s]tate's constitutional sovereign immunity must be clear and unambiguous." *Id.* ¶ 24.

**{21}**    Plaintiff implicitly recognizes that none of the statutes he relies upon explicitly waive sovereign immunity for USERRA claims.[4] Instead, he argues that the several statutes, when

---

[4]Minnesota provides an example of an explicit waiver of sovereign immunity for USERRA claims. *See, e.g.*, Minn. Stat. Ann. § 1.05(5) (West 2012) ("An employee . . . of the state who is aggrieved by the state's violation of [USERRA], may bring a civil action

read together, evidence the Legislature's intent to incorporate the benefits and protections of USERRA and provide a remedy for New Mexico service members when those rights are violated, including when the State itself is guilty of the violation. Although Plaintiff essentially argues for a constructive waiver of sovereign immunity, which is generally insufficient, we nevertheless examine these statutes to determine whether the "overwhelming implications from the text . . . leave no room for any other reasonable construction." *See Edelman*, 415 U.S. at 673 (citing *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)). We do this while bearing in mind the United States Supreme Court's caveat that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." *Edelman*, 415 U.S. at 673.

**{22}** Plaintiff directs most of his attention to NMSA 1978, Section 20-4-7.1(B) (2004), which provides that "[t]he rights, benefits[,] and protections of the federal [USERRA] of 1994 shall apply to a member of the national guard ordered to federal or state active duty for a period of thirty or more consecutive days." The purpose of this statute was to ensure that the rights, benefits, and protections of USERRA—which seemingly only applies to service members called to federal active duty—extended to national guard members ordered into *state* active duty. *See* 38 U.S.C. § 4303(16); 38 U.S.C. § 4312(c)(4)(E). However, as we determined above, subjecting unconsenting states to suit is not among the rights, benefits, or protections of USERRA, regardless of whether the national guard member was on state or federal active duty. Thus, there is no overwhelming implication from the text that by extending USERRA to national guard members called into state active duty, the Legislature intended to also waive the State's sovereign immunity to these suits.

**{23}** We are also unpersuaded that NMSA 1978, Sections 28-15-1 to -3 (1941, as amended through 1971) (reemployment of persons in armed forces) constitutes a waiver of state sovereign immunity for Plaintiff's USERRA claim. Plaintiff pursued a private suit for damages under USERRA against the State for allegedly discriminatory treatment by the State due to his military service. While Section 28-15-1 does grant service members a right to reemployment enforceable against State employers, it does not recognize a private suit for damages for alleged discrimination due to military service. We will not construe a state statute to act as the implied basis for a new claim arising from an expansive federal scheme when it would not have provided Plaintiff with a valid state claim for the original wrong actually suffered.

**{24}** Furthermore, it is likely that a service member seeking to enforce his or her rights under this statute against the State would be required to seek representation by a district attorney, not private counsel. *See* § 28-15-3 ("Upon application to the district attorney for the pertinent district by any person claiming to be entitled to the benefits of such provisions, such district attorney. . . shall appear and act as attorney for such person in the amicable

---

against the state in federal court or another court of competent jurisdiction for legal or equitable relief that will effectuate the purposes of that act.").

adjustment of the claim or in the filing of any motion, petition or other appropriate pleading and the prosecution thereof to specifically require the compliance with such provisions[.]"). Thus, to the extent that this statute does recognize a waiver of sovereign immunity—for rights to reemployment and lost wages—it does so in a very limited procedural context. *See Cockrell*, 2002-NMSC-009, ¶ 28 ("Nothing in *Alden* suggests that a waiver of sovereign immunity must be absolute, unconditional and applicable in all situations." (alteration in original) (internal quotation marks and citation omitted)); *see Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543 (2002) ("[W]ith respect to suits against a state sovereign in its own courts, we have explained that a [s]tate may prescribe the terms and conditions on which its consents to be sued[.]" (internal quotation marks and citation omitted)).

**{25}**     Finally, neither NMSA 1978, Section 20-1-2 (1987), nor NMSA 1978, Section 20-4-6 (1987) provides any basis for finding a waiver of sovereign immunity. Section 20-1-2 provides that the intent of the New Mexico Military Code is to conform New Mexico law on military matters to federal law on the same subject. However, as we have already determined, USERRA cannot validly override state sovereign immunity and, therefore, the Legislature's intention to mirror federal law does not evidence a waiver of sovereign immunity. Similarly, Section 20-4-6, which prohibits discrimination in employment of service members, neither defines the State as an employer subject to the statute nor creates a private civil cause of action. *See* § 20-4-6 (stating that "violation of this section shall be a misdemeanor"). Thus, these statutes, when read either individually or collectively, do not meet the exacting "clear and unambiguous" standards necessary for finding waiver of sovereign immunity for Plaintiff's USERRA claim.

**Policy Considerations**

**{26}**     Although we conclude that Plaintiff's claim is barred by state sovereign immunity, we take a moment to emphasize the responsibility of the State to comply with federal law. *See Gill*, 2004-NMSC-016, ¶ 10 ("[U]nder the federalist compact, the obligation of states to respect federal law and rights created thereunder is an essential corollary of state sovereignty."). This case does not present the first time our courts have grappled with the discord between rights afforded under a federal statute and a state agency's actions in contravention of that law. *See Cockrell*, 2002-NMSC-009, ¶ 27 ("We recognize the incongruity of the [s]tate's obligation to pay overtime wages in accordance with the FLSA without a concomitant method of enforcement for [its] employees."). As did the Court in *Cockrell*, we stress that "[o]ur holding in this case is certainly not intended to legitimize political defiance of valid federal law." *Id.* (alteration, internal quotation marks, and citation omitted). However, we also recognize that at a time when many of our veterans are returning home to an often uncertain economic climate, such pronouncements by our courts ring hollow to a veteran wronged by the very government he or she served to protect. We recognize that our Legislature is the appropriate branch of government to consider responding to the void created by *Alden* by unequivocally ensuring that our service members have the opportunity to vindicate their rights against public and private employers alike. *See Hartford Ins. Co. v. Cline*, 2006-NMSC-033, ¶ 8, 140 N.M. 16, 139 P.3d 176 ("The

12

predominant voice behind the declaration of public policy of the state must come from the legislature[.]").

**CONCLUSION**

**{27}** For the foregoing reasons, we conclude that CYFD is immune from suit and accordingly reverse the district court. Because of our decision in this case, we do not reach the issues in Plaintiff's cross-appeal regarding post-judgment interest.

**{28}** **IT IS SO ORDERED.**

                                      _____

                                        **CYNTHIA A. FRY, Judge**

**I CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**

**MICHAEL D. BUSTAMANTE, Judge (dissenting).**

**BUSTAMANTE, Judge (dissenting).**

**{29}** Respectfully, I disagree with the conclusion that the War Powers Clause does not provide Congress a font of power sufficient to subject the states to suit under USERRA. Before *Katz*, it seemed that the Supreme Court had foreclosed any argument that Article I could be a source of power sufficient to overcome state sovereignty claims. But the majority in *Katz* made clear that the Court's broad "dicta" in *Seminole Tribe* and *Alden* was just that: dicta. While *Katz* did not signal a full retreat from recent orthodoxy, it did make room for debate—at least as to those provisions of Article I, such as the War Powers Clause, which have not been addressed before.

**{30}** The first task is to frame the debate. What should the courts take into account in deciding the potential reach of Congress under a given Article? The list of germane topics will vary with the provisions under consideration. As such, it is not surprising that *Katz* is not helpful here when it discusses the nature of bankruptcy jurisdiction and practice. But there are general topics that cut across the Articles. *Katz* is relevant when it discusses the need for national uniformity with regard to bankruptcy laws. In doing so, *Katz* revived uniformity as a valid topic of consideration in Article I jurisprudence.

**{31}** Uniformity and concentration of authority loom large in the area of national defense—the subject of the War Powers Clause. As the United States in its amicus brief notes, the Clause both delegates war powers to the national government exclusively and

prohibits the states from making war, absent consent of the Congress. (U.S. Amicus Brief 16, 20). It seems obvious that national defense and foreign affairs are areas in which the country must speak as one.

{32} Intertwined with uniformity in this context are the nature and source of the power addressed by the War Powers Clause. By "nature" I mean to encompass the whole of the subject—including sending our armed forces to battle and the interest of the nation in protecting our service members in all ways possible when they return to civilian life. It cannot be gainsaid that the two are part of a spectrum of interests encompassed by the War Powers Clause. By "source" I refer to the oft-repeated observation that the individual states did not possess war powers at the time of the Constitutional Convention. The states had no sovereign interest to protect or cede when they approved the War Powers Clause. The lack of state sovereignty in this area then must have some effect on measuring the strength of the claim of immunity now.

{33} Comparing the interests and history at work in *Katz* with those at work here leads me to conclude that the War Powers Clause presents the more compelling case. The commercial interests addressed by the Bankruptcy Clause are important. But national defense stands on higher ground and provides a stronger basis to disallow state interference with Congress' will than that found in *Katz*.

{34} Similarly, the state's historical lack of sovereignty over the conduct of war argues against its resurrection here. In asserting this, I am not ignoring the difference between the power to conduct war and the power to refuse to allow suits seeking monetary compensation. But the distance between the two is not so vast that it cannot be spanned. The Court in *Katz* faced the same issue—as the dissent in *Katz* points out—yet found it necessary to resolve it in favor of Congressional power. The points made by the dissent in *Katz* simply cannot be made with equal force in connection with the War Powers Act.

{35} To a great degree, the Majority and I are simply prognosticating. A full debate with regard to the War Powers Clause as a source of power for USERRA has not yet been held before the United States Supreme Court. When it is, I believe the Court will hold that this is another Article I provision which should not be controlled by the dicta in *Seminole Tribe* and *Alden*. The matter is hardly without doubt. But I believe that Appellant's arguments and those of the United States in its amicus brief are closer to the mark.

_____

**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *Ramirez v. State ex rel CYFD*, No. 31,820**

**APPEAL AND ERROR**
Standard of Review

14

**CONSTITUTIONAL LAW**
Sovereign Immunity

**EMPLOYMENT LAW**
Termination of Employment

**FEDERAL LAW**
Armed Services
Bankruptcy

**GOVERNMENT**
Public Employee
Sovereign Immunity